**THE CAYUGA INDIAN NATION OF NEW YORK, et al., Plaintiffs,**

**and**

**The Seneca–Cayuga Tribe of Oklahoma and the United States of America, Plaintiff–Intervenors,**

**v.**

**George E. PATAKI, as Governor of the State of New York, et. al., Defendants.**

**Nos. 80–CV–930, 80–CV–960.**

United States District Court, N.D. New York.

March 11, 2002.

Rubinbaum LLP, New York City (Martin R. Gold, Raymond J. Heslin, of counsel), for Cayuga Indian Nation of New York.

Mariscal Weeks McIntryre & Friedlander, Phoenix, AZ (Glenn M. Feldman, Brian Mueller, of counsel), for Seneca–Cayuga Tribe of Oklahoma.

Hank Meshorer, Special Litigation Counsel, U.S. Department of Justice, Environment & Natural Division, Washington, D.C. (Roger R. Martella, Jr., Asst. Section Chief Indian, Resources Section of counsel), for U.S.

Hon. Eliot Spitzer, Attorney General of the State of New York, Albany, NY (David B. Roberts, Howard L. Zwickel, Christopher Hall, John Pickett, Assistant Attorneys General, of counsel), for State defendants.

Huber Lawrence & Abell, New York City (Theodore F. Duver, of counsel), for New York State Elec. & Gas Corp.

Goodwin Procter & Hoar, Boston, MA (Anthony M. Feeherry, of counsel), for Miller Brewing and De. Class.

Harris Beach & Wilcox, Rochester, NY (Brian Laudadio, of Counsel), for Def. Counties.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

The court assumes familiarity with this protracted land claim litigation, spanning more than two decades, based upon transactions occurring over two hundred years ago, and generating no less than 17 written decisions. Following two separate trials, on October 2, 2001, the court entered judgment in this case in the amount of $247,911,999.42, representing the jury's February 17, 2000, damage award of $36,911,672.62, and the court's subsequent prejudgment interest award of $211,000,326.80.

Not unexpectedly, entry of this judgment resulted in a flurry of motion activity. On October 17, 2001, three sets of motions were filed: (1) post-judgment motions setting forth six different grounds for relief on behalf of the State itself, as well as on behalf of the various State agencies and individual agency heads named in the original complaints ("the State");[1] (2) motions by the Cayuga Indian Nation of New York and the Seneca–Cayuga Tribe of Oklahoma ("the tribal plaintiffs") to amend the judgment and a "conditional motion"

---

1. *See Cayuga Indian Nation of New York v. Cuomo*, Nos. 80–CV–930, 80–CV–960, 1999 WL 509442, at *3—*4 (N.D.N.Y. July 1, 1999) (construing plaintiffs' respective complaints broadly, court read original complaints as including the State itself as a defendant, even though various State agencies and individual agency heads were named as defendants therein, but not the State itself).

for a new trial; and (3) the non-State defendants'[2] motion to amend the judgment. Several days later, on October 22, 2001, the plaintiff-intervenor the United States of America ("U.S.") filed a motion seeking to dismiss all defendants except the State from its complaint in intervention.

For analytical purposes, these motions can be broadly divided into two categories—those pertaining to amendment of the judgment and those seeking a new trial. In the former group are: (1) the non-State defendants' motion to amend the judgment pursuant to Fed.R.Civ.P. 52(b) and 59(e), making it final as against all parties; (2) the tribal plaintiffs' motion to amend the judgment allowing an immediate appeal of same in accordance with Fed.R.Civ.P. 54(b); and (3) the U.S.' motion to dismiss the non-State defendants from its complaint in intervention. As will be seen, although not identical, these three motions are closely related and hence the court will analyze them together; it will then separately analyze the remaining motions.

## I. Amendment of Judgment

### Background

The two motions to amend the judgment and the U.S.' motion to dismiss must be viewed in the larger context of this decades-old litigation, and particularly this court's decision in *Cayuga Indian Nation of New York v. Pataki*, 79 F.Supp.2d 66 (N.D.N.Y.1999) ("*Cayuga XI* "). Partially to avoid the unfathomable task of "conducting separate jury trials with respect to the approximately 7,000 private individual landowners, as well as the [other] non-State defendants[,]" among other things, in *Cayuga XI* this court granted the U.S.'

motion "to first proceed to trial against the State[.]" *Id.* at 74. "[T]he only direct opposition" to that motion was from the State "which argue[d] ... that separate trials would be inefficient given that it intends to offer basically the same proof at any and all trials conducted in connection with this action." *Id.* at 76. The court gave little credence to that opposition argument explaining, "[t]he only possibility of a substantial overlap in proof is remote indeed, ... given the repeated assurances by both the State and federal governments that if the court grants this motion for a separate trial, that will end this litigation." *Id.*

Then the court went on to enumerate the various assurances made by the U.S., the State and the tribal plaintiffs that once a judgment was entered against the State, those parties would *not* be pursuing further claims against the non-State defendants. *See id.* at 76–77. Given those assurances, the court found that "the likelihood of future subsequent trials seem[ed] all but moot[.]" *Id.* at 77. The court concluded by "stress[ing] that the non-State defendants, which by court order are not participating in this upcoming trial, *are not bound in any way*, such as through the application of collateral estoppel or res judicata, *by any determinations made in the State's damage trial.*" *Id.* at 77–78 (emphasis added). It is against this procedural backdrop which the court is considering the present motions to amend the judgment in this case, as well as the U.S.' motion to dismiss.

### Discussion

#### A. Rule 52(b)

Among other things, Rule 52(b) provides that "[o]n a party's motion filed no later

---

**2.** The non-State defendants consist of Miller Brewing Company, individually and as representative of the defendant class of approxi-

mately 7,000 landowners, as well as Seneca and Cayuga Counties.

than 10 days after entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed.R.Civ.P. 52(b). In accordance with this Rule, the non-State defendants are moving to amend the October 2, 2001 judgment so it is final as against *all* parties, even though the State was the only defendant participating in Phases I and II. *See* Affidavit of William Dorr (Oct. 16, 2001) ("Dorr Aff.") at 2, ¶ 2; *id.* at 4, ¶ 16 (emphasis added); *see also* Non–State Defendants' Notice of Motion at 1–2.

Offering two distinct bases for this motion, the non-State defendants first assert that the judgment should be amended to indicate that it is final as against all parties because otherwise there is a possible Seventh Amendment violation. Anticipating that despite prior assurances to the contrary, including those made in connection with the U.S.' motion for a separate trial, the plaintiffs will attempt to recover against the non-State defendants in subsequent trials, the non-State defendants are raising the possibility of inconsistent verdicts and hence a violation of the Seventh Amendment's guarantee to a jury trial. More specifically, the non-State defendants reason that in the event of future trials, their Seventh Amendment rights would be violated because a second jury would be reexamining facts and issues previously decided by the jury in Phase I, a proceeding in which those defendants did not participate.

As another reason for amending the judgment herein, the non-State defendants are relying upon the doctrine of judicial estoppel. In general, judicial estoppel " 'prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [the party] in a prior legal proceeding.' " *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 141 (2d Cir.2000) (quoting *Bates v. Long Island R.R.,* 997 F.2d 1028, 1037 (2d Cir.1993)). Because in *Cayuga XI* the tribal plaintiffs, the U.S. and the State vouched that after completing litigation against the State, those parties would *not be pursuing* further trials against the non-State defendants, *see Cayuga XI,* 79 F.Supp.2d at 77, the non-State defendants contend that "the tribal plaintiffs and the [U.S.] should be judicially estopped from seeking further trials against th[os]e ... defendants[;]" and based upon that estoppel, the court should amend the judgment to indicate that it is final as against all parties. *See* Memorandum of Law in Support of the Non–State Defendants' Motion to Amend the Judgment at 7. The non-State defendants are seeking this amendment "so that the judgment is final and the parties may proceed with an appeal of all issues they deem appropriate." Dorr Aff. at 2, ¶ 4. Alternatively, these defendants are "request[ing] that [the court] issue a scheduling order for motions for summary judgment on the issue of damages against the non-State defendants." *Id.* at 7, ¶ 26.

The State does not oppose this Rule 52(b) motion to amend. But if the court grants such relief, as the State observes, plainly there would be "no need for separate Rule 54(b) certification[,]" such as the tribal plaintiffs are seeking. *See* State Defendants' Memorandum of Law in Opposition to the Cayuga Plaintiffs' Motion to Amend the Judgment ("St.Oppn.Memo.") at 1, n. 1; and Letter from David Roberts to Court of 11/19/01 ("Roberts Ltr") at 1.

The tribal plaintiffs, on the other hand, do oppose the non-State defendants' motion to amend, reasoning that there is no possible Seventh Amendment violation because this court previously ordered separate trials as opposed to bifurcation. Implicit in this argument is the notion that because any subsequent trials would be

wholly separate, there would be no danger of a different jury trying factual issues which were previously decided by the jury in Phase I. Furthermore, the tribal plaintiffs contend that the Seventh Amendment is not implicated here, and thus cannot provide a basis for amending the judgment making it final as against all parties, because in *Cayuga XI* this court explicitly held that the non-State defendants would not be bound "in any way ... by any determinations made in the State's damage trial." *See Cayuga XI*, 79 F.Supp.2d at 77–78.

The tribal plaintiffs respond that the non-State defendants' judicial estoppel argument is similarly unavailing. In particular, the tribal plaintiffs assert that judicial estoppel does not apply here because the remarks upon which the non-State defendants are relying in this regard are "unsworn precatory remarks of counsel in different stages of the same proceeding[.]" Cayugas' Memorandum of Law in Opposition to Defendants' Post–Judgment Motions ("Cay.Oppn.Memo.") at 9. At a minimum, the tribal plaintiffs contend that this Rule 52(b) motion to amend is "premature[.]" *Id.* at 12.

The U.S. does not directly respond to the non-State defendants' Rule 52(b) motion to amend. The U.S. reasons, however, that its motion to dismiss all of the defendants except the State from its complaint in intervention renders moot "the non-State Defendants' concern that the [U.S.] would seek further trials or remedies from them[.]" *See* Plaintiff–Intervener United States' Response to Defendants' Post–Judgment Motions ("U.S.Resp.") at 34. The U.S. is overlooking the fact though that unless the court grants the non-State defendants' Rule 52(b) motion to amend the judgment, because the tribal plaintiffs are not making a similar dismissal motion, the non-State defendants would

remain defendants in this action at least with respect to the tribal plaintiffs' complaints. In any event, consistent with the representations it made in connection with its motion for a separate trial against only the State as a defendants, the U.S. once again asserts that it will *not* be "pursu[ing] any further trials or remedies against" the non-State defendants. *See id.* at 34–35 (emphasis added).

The non-State defendants retort that "it appears that the parties to this lawsuit *all concur* that the judgment should be amended to reflect that it is final and that no further trials should be held to award damages against the non-State defendants." Affidavit in Response to the Tribal Plaintiffs' Conditional Post Trial Motion and in Further Support of the Non–State Defendants' Motion to Amend the Judgment (Nov. 15, 2001) at 1–2, ¶ 2 (emphasis added). Clearly the non-State defendants have selectively reviewed the post-trial submissions because, as the preceding outline of the same reveals, the parties do *not* all agree that the court should amend the judgment in accordance with Rule 52(b). Accordingly, it is necessary for the court to more closely analyze the propriety of granting the non-State defendants' Rule 52(b) motion.

### 1. Seventh Amendment

■ The Seventh Amendment, which protects the right to a jury trial, reads as follows:

> In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII. This "Reexamination Clause does not limit or alter trial judges' historically broad discretion to sev-

er issues for trial[,]" *Simon v. Philip Morris Incorporated,* 200 F.R.D. 21, 34 (E.D.N.Y.2001); but it does prohibit a given issue from being tried by different, successive juries. *See In re Visa Check/Mastermoney Antitrust Litigation,* No. 00–7699, 2001 WL 1242717, at *29 n. 9 (2d Cir. Oct.17, 2001) (citing *Blyden v. Mancusi,* 186 F.3d 252, 268 (2d Cir.1999)). Thus, for example, in *Blyden* the Second Circuit found a Seventh Amendment violation where "both the liability ... and the damages juries were asked to determine whether the same acts constituted 'reprisals,'" thus "creat[ing] the real possibility—amounting to a probability—that acts found to be 'reprisals' by the liability jury were different from the acts found to be 'reprisals' by the damages juries." *Blyden,* 186 F.3d at 268 and 269. By engaging in "sound case management," however, such as "carefully defin[ing] the roles" of the "successive juries," and "carefully craft[ing] the verdict form[s][,]" it is possible for courts to avoid running afoul of the Seventh Amendment. *See Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 169 n. 13 (2d Cir.2001), *pet. for cert. filed,* 70 USLW 3429 (Dec. 17, 2001) (NO. 01–908).

█ In contrast to *Blyden,* at least at this juncture, there has been no showing of an actual Seventh Amendment violation in the present case. In fact, in the court's opinion the non-State defendants' claim of a Seventh Amendment violation is purely conjecture given the pledges catalogued by this court in *Cayuga XI* that the tribal plaintiffs, the U.S. and the State would *not* be pursuing further remedies against the non-State defendants. *See Cayuga XI,* 79 F.Supp.2d at 76–77. What is more, in the extremely unlikely event of subsequent trials against the non-State defendants, a violation of the Seventh Amendment would not necessarily follow because, as mentioned above, in *Cayuga XI* this court ex-

pressly held that the non-State defendants would not be bound in any way by determinations made in the State's trial. *See id.* at 77–78. Therefore, even if the practically inconceivable occurs, and there are subsequent trials against the non-State defendants, those defendants would not be bound by Phases I and II wherein the State was the only participating defendant.

Finally, despite the Seventh Amendment's guarantee to a jury trial, the court retains "substantial discretion to employ appropriate mechanisms of jury control[.]" *See Simon,* 200 F.R.D. at 33. Thus even if, as the State suggested in *Cayuga XI,* there is a substantial overlap in evidence between Phases I and II and any subsequent proceedings, it does not necessarily follow that a violation of the non-State defendants' Seventh Amendment rights would result. That is so because it would be possible to structure any subsequent trials in such a way so as to avoid violating the non-State defendants' right to a jury trial. *See Houseman v. U.S. Aviation Underwriters,* 171 F.3d 1117, 1127 (7th Cir. 1999) (citation omitted). In light of the foregoing, the non-State defendants' anticipatory constitutional breach does not justify amending the judgment to make it final as against all parties.

### 2. *Judicial Estoppel*

The non-State defendants' reliance upon judicial estoppel as a basis for amending the judgment herein is similarly misplaced. Positing that "[t]he tribal plaintiffs and [U.S.] should be judicially estopped from seeking further trials because they pledged to the Court that a single trial against the State would end" this litigation, the non-State defendants reason that "permit[ting] plaintiffs to backpedal now would seriously undermine the Court's decision to allow for a separate trial." Dorr Aff. at 6, ¶ 23. The court disagrees, and

for the reasons set forth below declines to apply the "rare remedy" of judicial estoppel as a means of amending the judgment this case. *See In re Bradlees Stores, Inc.,* No. 00–16033, 2001 WL 1112308, at *10 (S.D.N.Y. Sept.20, 2001) (citation omitted); *see also In re Venture Mortgage Fund, L.P.,* 245 B.R. 460, 472 (Bankr.S.D.N.Y. 2000) (internal quotation marks and citation omitted) (emphasis added) (Judicial estoppel "is a rarely used doctrine designed 'to protect the court, *not a party,* from a party's chicanery.' ").

■ "Although [the Supreme Court] ha[s] not had occasion to discuss [judicial estoppel] elaborately," it long ago explained that doctrine as follows:

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*New Hampshire v. Maine,* 532 U.S. 742, 748–49, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001) (quoting *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)). In contrast to equitable estoppel, "which is designed 'to ensure fairness in the relationship between parties[,]' " judicial estoppel is "a means to 'preserve the sanctity of the oath' or to 'protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.' " *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 71 (2d Cir.1997) (quoting *Bates,* 997 F.2d at 1037–38) (other citation omitted). "Because the rule is intended to prevent improper use of judicial machinery, . . . , judicial estoppel is an equitable doctrine invoked by a court at its discretion[.]" *New Hampshire,* 532 U.S. at 750–51, 121 S.Ct. at 1815 (internal quotation marks and citations omitted).

■ In *New Hampshire v. Maine,* the Supreme Court acknowledged that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle[.]" *Id.* (citations omitted). Despite that, the Court went on to identify "several factors [which] typically inform the decision whether to apply the doctrine in a particular case[.]" *Id.* "First, a party's later position must be *clearly inconsistent* with its earlier position." *Id.* (internal quotation marks and citations omitted) (emphasis added). "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled[.]" *Id.* (internal quotation marks and citations omitted). The third factor identified by the Supreme Court "is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (citations omitted).

Before examining whether the non-State defendants are entitled to rely upon judicial estoppel, it should be noted that in *New Hampshire* the Supreme Court stressed that by "enumerating th[o]se factors, [it][was] *not* establish[ing] inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id.* (emphasis added). Indeed, the Supreme Court, like the Second Circuit, has noted that a court's inquiry in assessing the applicability of judicial estoppel in a given case is inherently fact specific. *See id.; see also See United States v. West Productions, Ltd.,* 168 F.Supp.2d 84, 88 (S.D.N.Y.2001). Thus, in terms of the first element, the Second Circuit has instructed courts to look not only at the nature of the prior position, but also

whether that position was taken in a *"prior* proceeding." *See West Productions,* 168 F.Supp.2d at 87 (citing *Bates,* 997 F.2d at 1037) (emphasis added).

██ In assessing the first component of judicial estoppel, the court will assume for the sake of argument that the tribal plaintiffs, the U.S., or both are taking an inconsistent position with respect to the issue of future trials against the non-State defendants (*i.e.* they *will be* pursuing such trials despite contrary assurances made in connection with the U.S.' earlier motion for a separate trial against the State alone). Even giving the non-State defendants the benefit of that assumption, the court finds that those defendants are not entitled to rely upon judicial estoppel to amend the judgment because the plaintiffs did not take an inconsistent position in a *prior* proceeding. Significantly, "[t]he Second Circuit has *never* held that judicial estoppel can apply to inconsistent positions in the *same proceeding* [.]" *Tuff–N–Rumble Management v. Sugarhill Music Pub.,* 99 F.Supp.2d 450, 457 (S.D.N.Y.2000) (citations omitted) (emphasis added). "There are good reasons for not extending [judicial estoppel] to cover inconsistencies in the same proceeding[,]" as Judge Sweet soundly reasoned, "including the tensions between judicial estoppel and the liberal pleading standards of the Federal Rules, which permits alternative and inconsistent defenses, and the fact that the ultimate purpose of judicial estoppel, to prevent abuse of the courts by litigants, is easier to control when inconsistent facts are asserted in the same proceeding." *Id.; see also United States Fidelity & Guaranty Co. v. Petroleo Brasileiro S.A.,* No. 98 CIV 3099, 2001 WL 300735, at *10 (S.D.N.Y. March 27, 2001) (internal quotation marks and citations omitted) ("Circumspection in the use of judicial estoppel is warranted because of a concern for offending the liberal spirit of the federal pleading rules, and, in particular because of its tension with the alternative pleading provisions of Fed. R.Civ.P. 8(e)(2)."). In the present case, because the purportedly inconsistent statements were made earlier in this same proceeding and not in a prior, separate legal proceeding, the court agrees with the tribal plaintiffs that the non-State defendants have fallen short in satisfying the first judicial estoppel element.

Furthermore, "[b]ecause judicial estoppel is invoked to protect the integrity of the judicial process from the threat of inconsistent results, there must be a *true inconsistency* between the statements in the *two proceedings.* If the statements can be reconciled there is no occasion to apply an estoppel." *Simon,* 128 F.3d at 72–73 (citing, *inter alia, AXA Marine & Aviation Ins. (UK) Lt. v. Seajet Indus. Inc.,* 84 F.3d 622, 628 (2d Cir.1996)) (emphasis added). Although they recognize that a prior inconsistent statement is a prerequisite to applying judicial estoppel, the non-State defendants have not made any attempt to show such an inconsistency. The non-State defendants' focus upon what they deem to be the "unequivocal" nature of the tribal plaintiffs' and the U.S.' earlier statements, *i.e.* granting the U.S.' motion for a separate trial would mean "no further trials against the non-State defendants[.]" *See* Non–St. Def. Supp. Memo. at 8–9 (footnote omitted). The non-State defendants are missing the point however. It is not the unequivocal nature of the prior statement which is significant; rather it is the inconsistency of the subsequent statement which is determinative for judicial estoppel purposes.

Here, with respect to the plaintiff-intervenor U.S., there is no "clear inconsistency" in terms of its position regarding the non-State defendants. In fact if anything, the U.S.' position is even stronger

than it was in 1999 when it argued for a separate trial against the State as the sole defendant. At that time, the U.S. declared that "the case would end right there[ ]" if it obtained a judgment against the State, and "[t]here is no need for the[ ] 7,000 individual[ ] [landowners] to ever go to court." *See Cayuga XI,* 79 F.Supp.2d at 76 (internal quotation marks and citations omitted). Now, the U.S. is backing up those earlier statements with actions. As will be discussed more fully below, after reviewing the New York land claims, including the present one, "[t]he Departments of Justice and the Interior .. concur with the view of the prior Administration that it is the policy of the [U.S.] *not* to seek relief from parties in the New York land claims that acquired lands from the State or subsequent landowners in good faith." United States' Motion to Dismiss all Defendants from United States' Complaint Excepting New York State at 5 (emphasis added). "[T]o implement this policy[,]" the U.S. is now seeking to "*delet[e]* from ... [its] complaint *all claims and remedies against all parties* other than New York State." *Id.* (emphasis added). In light of the foregoing, the non-State defendants are extremely hard-pressed to show a "clear inconsistency" between the U.S.' prior litigation strategy with respect to the non-State defendants and the position which it is advancing as part of these post-judgment motions.

It is true that in contrast to the U.S., the tribal plaintiffs are not yet moving for dismissal of the non-State defendants from this action. The court is unwilling to find a "true inconsistency," however, between the tribal plaintiffs' earlier assertion that "as a practical matter if there is one trial against the State that will be it[,]" and their relative silence now on that issue. *See Cayuga XI,* 79 F.Supp.2d at 77 (internal quotation marks and citations omitted).

Indeed, the tribal plaintiffs' willingness to seek Rule 54(b) certification of an immediate appeal, in this court's view, conforms to its position several years ago in this litigation that a trial against the State alone would for all intents and purposes end this lawsuit. Thus far, the tribal plaintiffs have not affirmatively indicated that they intend to change horses in mid-stream and aggressively pursue claims against the non-State defendants. Therefore, as with the U.S., the court is unable to find a "clear inconsistency" in terms of the tribal plaintiffs' position regarding pursuing further trials against the non-State defendants.

In the absence of prior inconsistent statements in an earlier proceeding, none of the policies underlying judicial estoppel are thwarted in this case. This is not a situation where "plaintiffs have tried to obtain an advantage over their adversaries by litigating on one theory, and then seek[ing] an inconsistent advantage by pursuing an incompatible theory." *Motrade v. Rizkozaan, Inc.,* No. 95 Civ. 6545(DC), 1998 WL 108013, at *6 (S.D.N.Y. March 11, 1998) (internal quotation marks and citation omitted). In fact, as just mentioned and as will be discussed more fully below, the U.S. is holding steadfast to the position it took in 1999 when it moved for a separate trial against the State; it will not be seeking any relief against the non-State defendants in this action. To be sure, at least at this point the tribal plaintiffs are not following the U.S.' lead by making a similar motion to dismiss, but the current circumstances are a far cry from "a party [which] has 'sold' its position to one court[,]" and [which] is now " 'turn[ing] around and repudiat[ing] it in order to have a second victory.' " *See Motrade,* 1998 WL 108013, at *6 (quoting *AXA Marine,* 84 F.3d at 628) (other citation and quotation omitted). Moreover,

because the Second Circuit has "limit[ed] the doctrine of judicial estoppel to situations where the *risk* of *inconsistent results* with its impact on judicial integrity is *certain* [,]" *see Simon,* 128 F.3d at 72 (citing *Bates,* 997 F.2d at 1038) (emphasis added), and because such certainty is lacking here, there is no reason for the court to invoke this "rare remedy."

At the end of the day, the non-State defendants have failed to convince this court that it should exercise its discretion and apply the doctrine of judicial estoppel to amend the judgment. The non-State defendants have not met their burden of showing that any of the plaintiffs made a "truly inconsistent[ ]" statement; that is one which "necessarily precludes the truth of the other," *see Hotel Syracuse, Inc. v. City of Syracuse Industrial Development Agency,* 155 B.R. 824, 837 (Bankr. N.D.N.Y.1993) (citations omitted), much less that such a statement was made in a *prior,* "*separate* legal proceeding[ ][.]" *See Kunica v. St. Jean Financial, Inc.,* 233 B.R. 46, 58 (S.D.N.Y.1999) (citations omitted) (emphasis added). Accordingly, there is no need for the court to address the remaining judicial estoppel factors. What is more, the non-State defendants' inability to meet their burden of proof in this regard precludes granting their Rule 52(b) motion to amend the judgment based upon a finding of judicial estoppel. *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 18 F.Supp.2d 297, 301 (S.D.N.Y.1998) (citation omitted) (denying defendant's motion for judicial estoppel where defendant could not meet its burden of establishing the second element).

To conclude, given the tenuous nature of both the non-State defendants' Seventh Amendment and judicial estoppel arguments, the court denies without prejudice their motion to amend the judgment, to make it final as against all parties. As will

be seen, however, the denial of this motion does not mean that an immediate appeal cannot be had in this case; but the scope of that appeal will not be as broad as the non-State defendants are advocating on this Rule 52(b) motion.

### B. Rule 54(b) Certification

Like the non-State defendants, the tribal plaintiffs are moving to amend the judgment but they are relying upon a different federal rule. Instead of granting the non-State defendants' motion to amend the judgment making it final as against all parties under Rule 52(b), the tribal plaintiffs maintain, as Fed.R.Civ.P. 54(b) allows, that the court should certify for immediate appeal the October 2, 2001 judgment wherein the State is the only named defendant. Given the court's denial of the non-State defendants' motion to amend the judgment, this motion for certification becomes all the more significant.

 "When [a] district court has resolved at least one but fewer than all of the claims in an action, Rule 54(b) permits the court to direct the entry of a final judgment '*only* upon an express determination that there is no just reason for delay.'" *L.B. Foster Co. v. America Piles, Inc.,* 138 F.3d 81, 86 (2d Cir.1998) (quoting Fed.R.Civ.P. 54(b)) (emphasis added). Therefore, as Rule 54(b) "makes clear . . . if the District Court does not *both* direct entry of judgment *and* expressly determine that there is no just reason for delay, then its order or decision is not final, whether or not it is labeled a 'judgment.' " *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 631 (2d Cir.1995) (footnote omitted). Following issuance of this court's decision in *Cayuga Indian Nation of New York v. Pataki,* 165 F.Supp.2d 266 (N.D.N.Y.2001) ("*Cayuga XVI* "), the Clerk of the Court entered judgment in accordance therewith, but that judgment did not include a "no

just reason for delay" determination because at that time none of the parties were seeking entry of a final judgment under Rule 54(b). Thus, despite the State's assertion to the contrary, *see* Memorandum of Law in Support of State Defendants' Post–Judgment Motions ("St.Supp. Memo.") at 34, the absence of language allowing for immediate appeal of the October 2nd judgment was intentional. Now, however, the issue of whether the court should certify that judgment for immediate appeal is squarely before the court on the tribal plaintiffs' current motion made pursuant to Rule 54(b).

 A district court has discretion to enter a final judgment in accordance with the plain language of Rule 54(b), but "the exercise of [same] *must* follow the procedures set out [therein.]" *HBE Leasing*, 48 F.3d at 631 (emphasis added). More specifically, in exercising its discretion under that Rule, " '(1) multiple claims *or* multiple parties must be present, (2) at least one claim, or the rights or liabilities of at least one party, must be fully decided within the meaning of 28 U.S.C. § 1291, *and* (3) the district court must make an express determination that there is no just reason for delay and expressly direct the clerk to enter judgment.' " *Ishihara Chemical Co., Ltd.*, No. 99 MISC. 232(FB), 2000 WL 1898484, at *1 (E.D.N.Y. Dec.19, 2000) (quoting *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1091 (2d Cir.1992)) (emphasis added). Although "[t]he Second Circuit has cautioned against the overuse of Rule 54(b) certification," at the same time it "has also ... sanctioned the use of [such] certification 'where there are interest[s] of sound judicial administration and efficiency to be served.' " *See Bristol Technology, Inc. v. Microsoft Corp.*, 127 F.Supp.2d 85, 90 (D.Conn.2000) (quoting *Hogan v. Consol. Rail Corp.*, 961 F.2d 1021, 1025 (2d Cir.1992)) (other citations and internal quotations marks omitted).

 Strict adherence to Rule 54(b)'s requirements for certification of an immediate appeal arises out of "[r]espect for the 'historic federal policy against piecemeal appeals[.]' " *See L.B. Foster*, 138 F.3d at 86 (quoting *Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980)) (quoting in turn *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438, 76 S.Ct. 895, 901, 100 L.Ed. 1297 (1956)). This "policy promotes judicial efficiency, expedites the ultimate termination of an action and relieves appellate courts of the need to repeatedly familiarize themselves with the facts of a case." *Oklahoma Turnpike Authority v. Bruner*, 259 F.3d 1236, 1241 (10th Cir. 2001). Accordingly, the Supreme Court has consistently admonished that certification under Rule 54(b) should "*not* be granted routinely." *L.B. Foster*, 138 F.3d at 86 (citing *Curtiss–Wright*, 446 U.S. at 8, 100 S.Ct. at 1465) (other citation omitted) (emphasis added). Taking a similar view, on more than one occasion the Second Circuit has recognized that a court's power under Rule 54 " 'should be used only in the infrequent harsh case' where there exists 'some danger of hardship or injustice through delay which would be alleviated by immediate appeal.' " *Id.* (quoting, *inter alia*, *Brunswick Corp. v. Sheridan*, 582 F.2d 175, 183 (2d Cir.1978)) (other citations omitted). By the same token though, Rule 54(b) "attempts to strike a balance between the undesirability of more than one appeal in a single action and the need for making review available in a multiple-party or multiple-claim situations at a time that best serves the needs of the litigants.' " *See Oklahoma Turnpike Authority*, 259 F.3d at 1241 (quoting 10 Charles A. Wright, Arthur R. Miller & Mary Kay

Kane, *Federal Practice and Procedure: Civil 2d* § 2654 at 35 (1982)).

Keeping in mind the policies underlying Rule 54(b), the court will turn to the tribal plaintiffs' motion made thereunder.[3] In the present case, all three criteria for certification under Fed.R.Civ.P. 54(b) are met. As to the first element, not only are there multiple claims, but as should be patently obvious by now, there are also multiple parties. Among other things, in *Cayuga XI*, in denying the U.S.' motion for a finding of joint and several liability, the court reasoned that the tribal plaintiffs had sustained a divisible injury. *See Cayuga XI*, 79 F.Supp.2d at 72. Furthermore, the court found that the relationship among the defendants was akin to that of multiple tortfeasors, where "their wrongs are independent and successive[,]" but where "the State could be deemed an original or primary tortfeasor[ ]" due to its initial violation of the Nonintercourse Act. *Id.* at 73 (internal quotation marks and citation omitted) and 74. Indeed, in granting the U.S.' motion for a separate trial as against the State, the court effectively severed plaintiffs' claims against the non-State defendants from those of the State. Thus, because there are both multiple claims *and* multiple parties, the first element for certification under Rule 54(b) is satisfied in this case.

 Turning to the "fully decided" or finality aspect of Rule 54(b) certification, it is well settled that "[t]o be considered 'final,' an order must be 'final' in the sense that it is 'an ultimate disposition of an *individual claim* entered in the course of a multiple claims action.' " *Oklahoma Turnpike Authority*, 259 F.3d at 1242 (quoting *Curtiss–Wright Corp.*, 446 U.S. at 7, 100 S.Ct. at 1464) (quoting in turn *Sears, Roebuck & Co.*, 351 U.S. at 436, 76 S.Ct. at 900) (emphasis added). "While the exact definition of 'claim' for purposes of Rule 54(b) is unsettled, ..., a 'claim' is generally understood to include all factually or legally connected elements of a case." *Id.* (and cases cited therein). One commentator has explained this "notion of connectedness" as follows:

[A] judgment is not final unless the claims disposed of are separable from the remaining claims against the same parties. Separability is an elusive term, and no reliable litmus test exists for determining when a claim is a distinct claim of relief. Courts, however, have concentrated on two factors: (1) the factual overlap (or lack thereof) between the claims disposed of and the remaining claims, and (2) whether the claims disposed of and the remaining claims seek separate relief.

*Id.* at 1242–43 (quoting *Moore's Federal Practice 3d* § 202.06[2] ) (citing *Curtiss–Wright Corp.*, 446 U.S. at 8, 100 S.Ct. at 1464–65) (district court should "consider such factors as whether the claims under review were separable from the others re-

---

**3.** Before examining each of the Rule 54(b) criteria, the court is compelled to comment upon the fact that despite the stringent requirements outlined above for certification under that Rule, the tribal plaintiffs have provided only the most conclusory reasons for granting such relief. The tribal plaintiffs did not even bother to address the first two criteria for Rule 54(b) certification. And as to the third criteria, without providing either a factual or legal basis, they baldly assert that "[t]he posture of this case, ..., fully meets the requirements for the express determination that there is no just reason for delay and for direction for the entry of judgment." *See* Memorandum of Law in Support of Motion to Amend Judgment at 4 (citations omitted). Despite those deficiencies both the State and the U.S. agree, albeit for different reasons, that as Fed.R.Civ.P. 54(b) allows, the court should grant the tribal plaintiffs' motion for immediate appeal of the October 2, 2001 judgment.

maining to be adjudicated"). "Thus, a judgment is not final for the purposes of Rule 54(b) unless the claims resolved are distinct and separable from the claims left unresolved." *Id.* at 1243.

As previously discussed, in the context of the U.S.' motions for a finding of joint and several liability and for a separate trial, this court implicitly found that plaintiffs' claims against the State were "distinct and separable" from their claims against the non-State defendants. *See Cayuga XI,* 79 F.Supp.2d at 74. Furthermore, after the court's prejudgment interest award in *Cayuga XVI,* plaintiffs' claims against the State can also be considered final in that that decision effectively ended the litigation between those parties, leaving nothing for the court to do but to enforce the judgment if necessary. *See Ishihara Chemical,* 2000 WL 1898484, at *2 (citing *Ginett,* 962 F.2d at 1092). The merits of plaintiffs' claims against the State have now been completely resolved, as well as issues pertaining to plaintiffs' remedies against the State. Thus, the court finds that the finality aspect of Rule 54(b) certification is readily met here.

 The third requirement—an express determination that there is no just reason for delay—"has *not* been taken lightly by this Circuit." *See HBE Leasing,* 48 F.3d at 631 (emphasis added). For instance, the Second Circuit has "found an abuse of discretion where entry of judgment has been accompanied by a mere repetition of the statutory language that 'there is no just reason for delay,' without any reasoned explanation for such determination." *Id.* (citations omitted). Simply put, "a certification that is conclusory or merely quotes the words of … Rule [54(b)] is insufficient." *L.B. Foster Co.,* 138 F.3d at 86 (citations omitted). By the same token, however, relying upon the seminal case of *Curtiss–Wright,* the Sec-

ond Circuit has explained that "[w]here the court has directed the entry of final judgment as to claims that are separable from and independent of the unresolved claims, and has provided an informative explanation, its conclusion that there is no just reason for delay is entitled to 'substantial deference.'" *Id.* at 86–87 (quoting *Curtiss–Wright,* 446 U.S. at 10, 100 S.Ct. at 1466). Moreover, "[i]f the question of whether certification should have been granted is a close one, [the Second Circuit] will normally accept it if that course 'will make possible a more expeditious and just result for all parties.'" *Id.* (quoting *Gumer v. Shearson, Hammill & Co.,* 516 F.2d 283, 286 (2d Cir.1974)).

In the present case there is no just reason for delaying an immediate appeal of the October 2, 2001 judgment. In its role as " 'dispatcher' " under Rule 54(b) and in exercising its discretion thereunder, this court has determined that the " 'appropriate time' " for the appeal of this final decision regarding plaintiffs claims' against the State is now. (*See Curtiss–Wright,* 446 U.S. at 8, 100 S.Ct. at 1465) (quoting *Sears, Roebuck,* 351 U.S. at 435 and 437, 76 S.Ct. at 899 and 900). Surely this case involving a wrong which occurred over 200 years ago and litigation spanning two decades is one of the few "infrequent harsh case[s]" warranting certification under Rule 54(b). *See L.B. Foster,* 138 F.3d at 86 (internal quotation marks and citations omitted). Reviewing plaintiffs' claims against the State at this juncture would best serve the needs of *all* litigants, including the non-State defendants. If on appeal plaintiffs' claims against the State are upheld and it remains liable for the entire amount of damages sustained by plaintiffs, that would obviate the need for any further litigation by the plaintiffs against the non-State defendants. Furthermore, even if the State pursues claims for contribution

or indemnification or both against the non-State defendants, the tribal plaintiffs "should not be forced to await the outcome of that separate, distinct and independent quarrel before judgment is entered on [their] behalf." *See id.* (citation omitted). If, on the other hand, the court declines to certify plaintiffs' claims against the State for immediate appeal, a considerable delay would undoubtedly result as at least the tribal plaintiffs pursue their remaining claims against the non-State defendants.[4] Given that there are approximately 7,000 non-State defendants, the resulting delay from those subsequent trials is practically incomprehensible.

The likelihood of a substantial delay is exacerbated by the possibility that the tribal plaintiffs will not expeditiously pursue claims against the non-State defendants and in the meantime focus on settlement with the State instead. The court hastens to add, as it has always maintained, that settlement is a laudable goal here, and even at this advanced stage in the litigation the court continues to strongly encourage the parties to renew such efforts. In this regard, the court commends the U.S.' recent declaration that "[e]ven if the judgment becomes appealable, the [U.S.] stands willing to recommence settlement discussions and is willing to support reasonable stays before the District Court and the Second Circuit to facilitate settlement discussions." U.S. Resp. at 30.

In any event, clearly any danger of hardship or injustice, especially to the non-State defendants, could easily be alleviated by granting the tribal plaintiffs' motion for certification of an immediate appeal of the October 2, 2001 judgment. Given the course this litigation would take absent an immediate appeal of plaintiffs' claims against the State, *i.e.* countless trials involving 1000s upon 1000s of private landowner defendants, it is hard to imagine a case where the interests of judicial administration and efficiency would be better served by entry of a final judgment in accordance with Fed.R.Civ.P. 54(b). Furthermore, as the U.S. soundly reasons, "[a]llowing an appeal by the State prior to any further proceedings involving the other defendants is consistent with the Court's decision to bifurcate the damages trial as it may lead to a final resolution of all the issues in this case *without further burden on other parties.*" *Id.* at 30 (emphasis added). As the foregoing discussion also makes clear, the equities involved here, especially pertaining to the individual private landowners also weigh heavily in favor of granting the tribal plaintiffs' Rule 54(b) motion. Finally, the substantial public import of the issues which this land claim litigation raises, especially taking into account the considerable amount of prejudgment interest awarded, provides further justification for an immediate appeal of the October 2, 2001 judgment. *See Hudson River Sloop Clearwater v. Dept. of Navy,* 891 F.2d 414, 419 (2d Cir.1989). In short, because all of the criteria for certification of an immediate appeal of this court's October 2, 2001 judgment under

---

4. As will be more fully discussed above, at least at this juncture the U.S. is taking the position that it will not be pursuing any relief against the non-State defendants in this land claim action. Given the court's familiarity (borne from presiding over same for more than 20 years) with land claims in New York, it is extremely hesitant to speculate as to the future course of this lawsuit. In the court's experience, parties' litigation strategies frequently change, often times depending upon which way the political wind is blowing; so while the U.S.' current position is that it will not be pursuing any relief from the non-State defendants, the court can envision that policy changing, especially if this lawsuit continues to proceed at a glacial pace.

Rule 54(b) have been met, the court hereby grants the tribal plaintiffs' motion for such relief.

## C. Motion to Dismiss

Currently the U.S.' policy with respect to New York land claims including the present one, is *"not* to seek relief from parties ... that acquired lands from the State or subsequent landowners in good faith." United States' Motion to Dismiss all Defendants from United States' Complaint Excepting New York State ("U.S. Dismissal Memo.") at 5 (emphasis added). This represents a shift in policy from the time the U.S. first intervened in this lawsuit in 1992. At that time, mirroring the complaints of the tribal plaintiffs, the U.S. named several non-State entities as defendants as well as the class of private landowners. *See* U.S. Complaint in Intervention at ¶ 5. Since 1992 there have been several legal developments which the U.S. claims have prompted it to change its policy in terms of the role of private landowners in New York land claim actions. Those legal developments are outlined in the U.S.' memorandum of law filed in support of this motion to dismiss, and there is no need to repeat the same herein. *See* U.S. Dismissal Memo. at 3–4.

Suffice it to say that after reviewing those legal developments, slightly more than a year ago, on the eve of a new federal government administration, the U.S. advised the parties in several of the New York land claims that "at the appropriate time[,]" it would be "fil[ing] motions ... to hold that New York State is liable for any and all remedies awarded by the court and that the [U.S.] does *not* need the private landowners in its suit to obtain full relief from the State on behalf of the

Tribes." *Id.* at 4 (internal quotation marks omitted). Thereafter, the U.S. began implementing that policy by, for instance, filing a motion to amend its complaints to omit the State as a defendant in *Canadian St. Regis Band of Mohawk Indians v. State of New York,* No. 82–CV–783, 82–CV–1114, 89–CV–829, another land claim action which is currently pending before this court. Just recently the court granted the U.S.' motion in that regard deleting "all claims and remedies against defendants other than the State and the [New York Power Authority]." *Canadian St. Regis Band of Mohawk Indians v. New York,* 205 F.R.D. 88, 90 (N.D.N.Y.2002) (footnote omitted). The present motion is yet another example of the U.S. implementing this policy change with respect to private landowners who acquired their property in good faith.

As in *Canadian St. Regis,* the State does not oppose this motion by the U.S., explaining that in its view "[t]here was never any good reason for the plaintiffs, including the ... [U.S.], to pursue a claim for ejectment and for damages against the Counties and the individual landowners." *See* Roberts Ltr at 1. Calling the U.S.' motion "a welcome change in policy and rhetoric,"[5] the non-State defendants do not oppose this motion, but they view it as an "empty offer" given that the tribal plaintiffs are not making a similar motion. *See* Non–State Defendants' Response to the Plaintiffs' Post–Trial Motions at 4 (citation omitted).

The tribal plaintiffs *are* opposing this motion to dismiss, describing it as "premature" because the State has not adopted the view that it should be "held entirely and singularly liable for all damages in this

5. The non-State defendants improperly characterize the U.S.' motion as one to amend

whereas it is actually a motion to dismiss.

case[.]" Cay. Oppn. Memo. at 12. In fact, as recently as November 19, 2001, the State "reiterate[d] and incorporate[d] its prior opposition to the Court's damages' rulings in this case, including but not limited to, the court's determination to hold the State responsible for all damages (including prejudgment interest) covering the entire period of the Cayugas' alleged dispossession." *See* Roberts Ltr at 1. As a point of clarification, the U.S. accurately notes that earlier in this litigation the court "interpreted the ['U.S.'] Complaint In Intervention as asserting claims for relief against the State ... as well as the individual and State agency defendants included in the complaint and complaint in intervention of the tribal plaintiffs." *Id.* at 1–2 (citation omitted). Furthermore, the tribal plaintiffs point to the fact that the State has not yet "forsworn any claims for contribution or indemnification from the Non-State Defendants." *See* Cay. Oppn. Memo. at 12. The tribal plaintiffs also note that the State "has not abandoned its Eleventh Amendment defense, which, if successful, would relegate the Cayugas to pursuing their claims against the Non-State Defendants." *Id.* Lastly, the tribal plaintiffs observe that the State has indicated that it intends to appeal at least the issue of its liability. *See id.* Thus the tribal plaintiffs strongly urge this court to "hold in abeyance" the U.S. "motion to dismiss the non-State defendants pending the determination of *all* appeals." *Id.* (emphasis added).

There is no need to hold the U.S.' motion in abeyance. Given the procedural posture of this action, especially in recent years where the plaintiffs, albeit guided by rulings from this court, have been intent on pursuing relief from the State alone, the court hereby grants the U.S.' motion to dismiss all defendants from its complaint in intervention except the State of New York. Of course, at least for the time being the non-State defendants remain in this action by virtue of having been named in the tribal plaintiffs' respective complaints.

### D. Interim Prejudgment Interest

In *Cayuga XVI*, this court did not explicitly address the issue of whether plaintiffs were entitled to recover prejudgment interest for the period between the jury's February 17, 2000, verdict and October 2, 2001, the entry date of the judgment ("interim prejudgment interest"). Implicit in *Cayuga XVI* was the assumption, however, that the $200 million plus prejudgment interest awarded therein included interest for that interim period as well as for the preceding years. One day after entry of the judgment the tribal plaintiffs immediately sought clarification of *Cayuga XVI*, asserting that the lack of any specific mention of interim prejudgment interest created a "potential ambiguity[.]" *See* Affirmation in Opposition to Plaintiffs' Motion to Amend the Judgment (Nov. 14, 2001) ("Roberts Affirm."), exh. A thereto (Letter from Martin Gold to Court of 10/03/01). Vehemently opposing such clarification, the State responded by noting the potential for a substantial additional award of prejudgment interest above and beyond the roughly $211 million already awarded by the court. *See id.*, exh. B thereto (Letter from David Roberts to Court of 10/09/01 ("Roberts 10/09/01 Ltr") at 2–3). Refusing to award interim prejudgment interest, the court flatly stated "[t]hat [the October 2, 2001,] judgment will stand as a final order of this court[,]" and it "decline[d] to alter or amend same." *Id.*, exh. C thereto at 2. Despite the court's clear rejection of this request for interim prejudgment interest, the tribal plaintiffs are again seeking such interest. This time that request is in the form of a motion to amend the judgment made pursuant to

Fed.R.Civ.P. 52(b), 59(e), and 60(a). *See* Tribal Plaintiffs' Amended Notice of Motion at 2, ¶ (b).

There are two components to the tribal plaintiffs' request for additional prejudgment interest. First, they are seeking such interest on the jury's $35 million dollar award for the fair market value of the claim area. Prejudgment interest on that award should include the time frame from February 27, 2000, the verdict date, through October 2, 2001, the entry date of the judgment. The tribal plaintiffs are proposing two different rates for that interest—"either at the *post*-judgment rate applicable to judgments entered at that time of 6.278%, *or* at the rate of 5.54% testified to by Dr. Berkman, compounded annually[.]" *Id.* (emphasis added). The tribal plaintiffs are also attempting to recover additional prejudgment interest "upon the jury's rental award of $1,911,672.62 and the Court award of $211,000,326.80 of prejudgment interest thereon through June 30, 2000, calculated from June 30, 2000 to October 2, 2001." *Id.* The tribal plaintiffs are seeking additional prejudgment interest commencing on June 30, 2000, because in *Cayuga XVI*, the court adopted, with some modifications, the prejudgment interest calculations of the U.S.' economic expert, Dr. Berkman, but he only calculated such interest through June 30, 2000. According to the tribal plaintiffs, and in keeping with the formula employed by this court in *Cayuga XVI* of reducing Dr. Berkman's calculations by 60%, such interest should be awarded "at the rate of 5.54%, compounded annually and reduced by sixty (60%) percent[.]" *Id.*

Putting aside for the moment the issue of whether the tribal plaintiffs have any legal basis for their request for additional prejudgment interest, the court cannot overlook the practical implications of same. As has been the case since the prejudgment interest issue first arose in this case, the figures are not inconsequential. For instance, applying "Dr. Berkman's year 2000 rate of 5.54% compounded to the accrued rent principal and interest from July 2, 2000 to October 2, 2001 and then reduc[ing] that amount by 60%[,]" would result in additional prejudgment interest for rent of approximately six million dollars. Roberts Affirm. at 2, ¶ 5, and exh. D thereto. Calculating additional prejudgment interest on the $35 million jury verdict "using the post-judgment interest rate in effect on February 17, 2000, compounded annually[,]" would result in interim interest on that sum of $3,648,630.19. *Id.* at 2, ¶ 6; and exh. E thereto. Using the post-judgment interest rate calculated in accordance with 28 U.S.C. § 1961(a),[6] which the State claims is 2.49% for the October 2, 2001 judgment, and reducing that amount by 60% would yield $569,827.86 in additional prejudgment interest on the $35 million jury verdict. *See id.* at 2, ¶ 6; and exh. F thereto.

In no uncertain terms the State responds that "the court should adhere to its prior ruling and refuse to amend the judgment to add approximately ten million dollars in additional prejudgment interest." St. Oppn. Memo. at 1. The court agrees with the State that the tribal plaintiffs' backdoor attempt to obtain additional prejudgment interest—interest the court has already refused to award—is completely unfounded. Although not framed as a mo-

6. Unlike prejudgment interest rates, post-judgment interest rates are statutorily governed by 28 U.S.C. § 1961(a) which provides that "computations of post-judgment interest are based on the weekly average 1-year con-stant maturity Treasury yield, for the calendar week preceding the date of judgment." Roberts Affirm. (11/14/01), exh. B thereto (Roberts 10/09/01 Ltr at 2).

tion for reconsideration, clearly that is what the tribal plaintiffs are seeking; yet they have not identified any of the three grounds that form the basis for such a motion in this district. *See, e.g., Sumner v. McCall,* 103 F.Supp.2d 555, 557 (N.D.N.Y.2000) (internal quotation marks and citations omitted) (emphasis added). ("Generally, the prevailing rule in the Northern District recognizes *only* three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice."). Moreover, in seeking interim prejudgment interest on the jury's $35 million damage award for the current value of the claim area, the tribal plaintiffs are conveniently overlooking the fact, as the State is quick to point out, that prior to the Phase II hearing regarding the issue of prejudgment interest, this court "stress[ed] . . . that any [such] interest award would be confined to the rental value damages award." *See Cayuga Indian Nation of New York v. Pataki,* Nos. 80–CV–930 and 80–CV–960 (N.D.N.Y. April 18, 2000) at 6. Finally, to the extent the tribal plaintiffs are maintaining that an award of interim prejudgment interest is mandatory, otherwise they will not have received full and just compensation, the court disagrees.

To support this argument, the tribal plaintiffs improperly rely upon *Magee v. U.S. Lines, Inc.,* 976 F.2d 821 (2d Cir. 1992). To be sure, there, the Second Circuit did remand that case because the district court denied plaintiff recovery of prejudgment interest, *see id.* at 823; but that was a maritime claim, and as this court noted in *Cayuga XVI,* in the maritime context "there is a 'traditional hospitality to prejudgment interest[.]' " *See Cayuga XVI,* 165 F.Supp.2d at 295 (quot-

ing *City of Milwaukee v. Cement Div., Nat. Gypsum Co.,* 515 U.S. 189, 196, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995)). Thus, *Magee* does not in any way advance the tribal plaintiffs' argument that an award of interim prejudgment interest is mandatory in the present case.

■■■ Moreover, as with nearly all aspects of prejudgment interest, whether to award the same for the interim period between a verdict and entry of judgment lies within the court's sound discretion. *See, e.g., United States of America for the Benefit of Towerridge, Inc. v. T.A.O., Inc.,* No. Civ–95–42–BL, 1996 WL 924671, at *3 (W.D.Okl. June 11, 1996) ("The court in its discretion and based on equitable considerations finds that prejudgment interest should be awarded on the amount of the verdict beginning on the 13th day of November, 1994, until the date of judgment."). Here, the court declines to exercise that discretion to make such an award. In its 100 page decision in *Cayuga XVI,* this court thoroughly addressed the prejudgment interest issue and made what is undeniably a substantial award of same to the tribal plaintiffs. Such interest, in combination with the jury's verdict of $36,911,672.62 has resulted in the tribal plaintiffs receiving full and just compensation even without an award of interim prejudgment interest.

### E. Exclusivity of Judgment

Inadvertently omitted from the October 2, 2001 judgment was any reference to the U.S., as plaintiff-intervener on behalf of the tribal plaintiffs. Evidently this omission prompted the State's motion pursuant to Fed.R.Civ.P. 59(e) to amend that judgment "to run solely, *or at least jointly,* in favor of the [U.S.] as trustee for all successors-in-interest of the historic Cayuga Indian Nation." St. Supp. Memo. at 26 (foot-

note omitted) (emphasis added).[7] The State reasons that such an amendment is necessary to ensure that "[t]he [U.S.,] either by itself or under judicial supervision, will thereby be responsible for ensuring that any judgment issued in this case is allocated appropriately among all tribes that are descended from the historic Cayuga, including the plaintiffs and any other such tribes that may have standing to sue under the Nonintercourse Act .... " *Id.* at 26–27 (footnote omitted). The State offers three separate reasons as to why the judgment should be amended. From the State's perspective, through such an amendment "the Court will ensure: (1) that all descendants of the historic Cayuga Indian Nation share in the award in this case, which by its own terms provides full compensation for the harm allegedly suffered by the Nation in 1795 and 1807; (2) that further judicial resources will not be unnecessarily expended on this claim; and (3) that the State and other defendants will not be subjected to the possibility of multiple liability for a single harm to the Nation." *Id.* at 27.

Although it agrees that "the Court should amend the judgment to reflect that the judgment runs jointly in favor of the [U.S.], the Cayuga Indian Nation, and the Seneca–Cayuga Tribe," the U.S. specifically requests that "the Court defer consideration of the State's suggestion that the judgment run *exclusively* in favor of the [U.S.]" *See* U.S. Resp. at 1 (emphasis added). In a similar vein, the tribal plaintiffs do not object to modification of the judgment to run jointly in their favor, as well as in favor of the U.S., as trustee for the tribal plaintiffs. *See* Cay. Oppn. Memo. at 13. The tribal plaintiffs do object, however, to amending the judgment as the State

suggests "for the potential benefit 'of all successors-in-interest of the historic Cayuga Indian Nation.' " *Id.* at 14 (quoting St. Supp. Memo. at 26). From the tribal plaintiffs' viewpoint, such an amendment "would convert this from a judgment awarded to benefit the two specific tribal plaintiffs to an open-ended class-action type judgment fund that could be used to pay future damage awards to an ill-defined class of non-parties and other strangers to this litigation." *Id.* The court does not agree with this characterization of the State's motion, but for the reasons set forth below it does agree with the U.S. and the tribal plaintiffs that the proper way to proceed at this juncture is to amend the October 2, 2001 judgment to reflect that the U.S., as trustee for the tribal plaintiffs, is also a plaintiff-intervener in this action and the judgment runs jointly in favor of the U.S. and those plaintiffs. Basically Rule 60(a) allows a court to correct clerical errors in a judgment "at any time of its own initiative or on the motion of any party[.]" Fed.R.Civ.P. 60(a). As that Rule allows and because the parties readily agree, as just indicated, the court will amend the October 2, 2001 judgment to reflect that that judgment runs jointly in favor of the U.S. and the tribal plaintiffs.

To the extent that the State is seeking to amend that judgment to run exclusively in favor of the U.S., however, the court denies the State's motion. The U.S. identifies several persuasive reasons as to why at this time the court should *not* hold that the judgment runs exclusively in favor of the U.S. Perhaps most significant is the fact that "this issue [of exclusivity] raises questions of both law and policy for the [U.S.] and for the tribal plaintiffs, including, for example, whether the [U.S.] and/or

---

7. The State is seeking this amendment in the event the court does not vacate the judgment. Obviously, because the court refuses to vacate the judgment, it must address this motion to amend the judgment.

the tribal plaintiffs should hold the principal jointly or exclusively, how the principal should be allocated between the New York Cayuga, the Seneca–Cayuga, and other potentially interested parties, and how the principal should be invested and disbursed." U.S. Resp. at 27. The court concurs with the U.S.' assessment of these important law and policy concerns, which, if possible, should be resolved outside the litigation arena:

> The ramifications of such decision need to be analyzed by decision makers at the Interior and Justice Departments, as well as by the tribal plaintiffs. The Plaintiffs also need to come together and consult with each other in the aim of coming to a resolution that ideally would alleviate any need for further court involvement in how the money should be handled.

*Id.* To date, such discussions have not occurred, but the court places great credence in the U.S.' representation that between now and the time the judgment is actually executed, it "will work toward an agreement with all the Plaintiffs that ideally would be presented jointly to the Court." *Id.* In light of the foregoing, the court hereby grants the State's motion to amend the judgment to provide that the judgment runs jointly in favor of the plaintiff-intervener the U.S., as trustee, *and* the tribal plaintiffs. The court denies the State's motion without prejudice to renew, however, to the extent that the State is seeking to amend the judgment to reflect that it runs exclusively in favor of the U.S.

## II. New Trial

### A. State Defendants' Motions

#### 1. Vacate Judgment & JMOL

As Fed.R.Civ.P. 50(b) permits, the State is renewing its motion for judgment as a matter of law. Then, as now, the State is challenging the opinion testimony of the U.S.' expert real estate appraiser, Arvel Hale, contending that his "sales data were unreliable" and his "methodology failed to meet the standards of *Daubert* and *Kumho Tire* [.]" [8] St. Supp. Memo. at 3 and 8. Thus the State asserts that "the court should enter judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) and dismiss plaintiffs' claim for damages *and* prejudgment interest against the State defendants[.]" *Id.* at 1 (emphasis added). In other words, the State is seeking to nullify both the jury verdict and this court's subsequent prejudgment interest decision so that it will bear no financial responsibility for violating the Nonintercourse Act in its dealings with the Cayuga in 1795 and again in 1807.

This is not the first time the court has had before it challenges to the reliability of Mr. Hale's sales data and to his methodol-

---

**8.** As the parties are well aware, "[i]n *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court instructed that the Federal Rules of Evidence require the trial court to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' " *Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 91 (2d Cir.2000) (quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786). Subsequently, in *Kumho·Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court made "clear that this gate-keeping function applies not just to scientific expert testimony" as discussed in *Daubert,* but also to testimony based on " 'technical' and 'other specialized' knowledge.' " *Id.* (quoting *Kumho Tire,* 526 U.S. at 141, 119 S.Ct. 1167) (quoting in turn Fed.R.Evid. 702). In accordance with this case law, this court conducted a comprehensive *Daubert* hearing with respect to the three real estate appraisers which the parties retained to value the claim area. *See Cayuga Indian Nation of New York v. Pataki,* 83 F.Supp.2d 318 (N.D.N.Y.2000) (*"Cayuga XIII "*).

ogy. In fact, the State has previously made these arguments on three separate occasions: (1) as part of its pre-Phase I motion *in limine* to preclude Hale's testimony; (2) in connection with the seven day *Daubert* hearing; and (3) as part of the State's motion for judgment as a matter of law made at the close of all of the proof during Phase I. Each time the court rejected the State's challenges. Following the *Daubert* hearing the court found, among other things, that Hale's testimony was both "reliable and relevant[,] ... and w[ould] assist the jury in deciding the property valuation issue[.]" *See Cayuga XIII*, 83 F.Supp.2d at 328. At the close of the Phase I proof, the State again attacked Mr. Hale's testimony and the court again rejected that attack, denying the State's Rule 50 motion in that regard. *See* Transcript (Feb. 10, 2000) at 2310–29. There is nothing in this renewed motion by the State which convinces the court at this late date to alter its prior decisions.

■■■ Besides offering nothing more than a rehash of arguments, the court hastens to add that the State's renewed Rule 50 motion improperly focuses solely upon the proof presented through Hale, rather than upon the record as a whole. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000) (emphasis added) ("[I]n entertaining a motion for judgment as a matter of law, the court should review *all* of the evidence in the record."). When the court, as it must, considers not just Mr. Hale's testimony, but the record as a whole pertaining to property valuation, it remains convinced that there is no basis for the State's challenge to *either* his data or his methodology. The weaknesses in the State's argument become all the more apparent taking into account the "strict" standard which the State must satisfy before it would be entitled to judgment as a matter of law. *See Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988). "Judgment as a matter of law is proper under Fed.R.Civ.P. 50 *only* if, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Caruso v. Forslund*, 47 F.3d 27, 32 (2d Cir.1995) (emphasis added) (internal quotation marks and citations omitted).

■■■ Given the undeniably novel valuation issues presented by the damage phases of this litigation, as the record makes abundantly clear, most certainly this is *not* a case where "there c[ould] be but one conclusion as to the verdict that reasonable [persons] could have reached." *See id.* Indeed, again largely because of the unique property valuation issues presented herein, there were a myriad of conclusions which reasonable persons could have drawn from the Phase I record evidence. Moreover, adopting the State's arguments regarding Hale's testimony would require the court to make credibility determinations, weigh the evidence, or both, and that is *not* a court's function on a Rule 50 motion such as the present one. *See Raniola v. Bratton*, 243 F.3d 610, 616 (2d Cir.2001).

Finally the court observes that "the Second Circuit espouses a particularly broad standard for the admissibility of expert testimony[,]" such that "after *Daubert* ... rejection of expert testimony is the exception rather than the rule." *See Colon v. BIC USA, Inc.*, No. 00 CIV. 3666, 2001 WL 1631402, at *11 (S.D.N.Y. Dec.19, 2001) (internal quotation marks and citations omitted). Accordingly, as it has each and every time it has been presented with the State's opposition to Mr. Hale's testimony, the court rejects those arguments

and denies the State's motion for judgment as a matter of law based on same.

## B. Alternative Relief

Because the court has denied the State's motion for judgment as a matter of law, it must next consider the State's motion for alternative relief. In particular, alternatively, the State is seeking to have the court "either reconsider its calculation of prejudgment interest *or* order a new jury trial concerning the rental value of the property in the claim area." St. Supp. Memo. at 17 (emphasis added). The State reasons that such relief "is appropriate because the jury seriously misjudged the year by year fair rental value of the claim area *and* the Court explicitly declined to take this mistake into account in its discretionary calculation of prejudgment interest." *Id.* at 18 (footnote omitted) (emphasis added).

### 1. Prejudgment Interest Recalculation

The State's motion for recalculation of the prejudgment interest award suffers from the same infirmity as its motion for judgment as a matter of law: the State is not offering any new arguments which would justify such reconsideration. In arguing that the court should reconsider its calculation of prejudgment interest, the State contends that "[t]he fair rental values indicated on the verdict form do not comport either with the Court's instructions to the jury or with the testimony at trial." *See id.* at 19. The court discussed and resolved both of those issues in *Cayuga XVI. See Cayuga XVI*, 165 F.Supp.2d at 273–84; and 358–363. Furthermore, as the U.S. accurately notes, the State has "present[ed] no facts or law contradicting the Court's finding[s]" in this regard. U.S. Resp. at 18.

Moreover, the court agrees with the U.S.' observation, made in a slightly different context, that the State's arguments have not become more persuasive by repetition. *See id.* at 4. Nor does repetition of these previously unavailing arguments satisfy the "demanding standard" for reconsideration in this Circuit. *See Sumner,* 103 F.Supp.2d at 558. As Judge Kahn so aptly wrote in *Sumner,* "[a] simple difference of opinion, no matter how deep it runs, will not warrant reconsideration." *Id.* at 558–59. Rather than amounting to a clear error of law, which is a possible basis for reconsideration, the court's prior rulings as to the fair rental value aspect of the jury's verdict, which the State again is disputing, are " 'simply a point of disagreement between the Court and the litigant[,]' " and do not provide a sufficient basis for disturbing the jury verdict. *See id.* at 559 (quoting *In re C–TC 9th Ave. Partnership,* 182 B.R. 1, 3 (N.D.N.Y. 1995)). Accordingly, the court hereby denies the State's motion for reconsideration, seeking to have the court recalculate the amount of prejudgment interest due in this case.

### 2. Fair Rental Value Damages

If the court declines, as it has, to modify its prejudgment interest calculation, then the State is moving for a new trial "solely on the issue of fair rental value damages." *See* St. Supp. Memo. at 26. In making this motion, the State is relying upon Fed. R.Civ.P. 59(a), which generically provides that a district court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1). The State again harkens back to its previously unsuccessful argument that "[t]he jury's conclusion that the fair rental value was an identical $17,156.86 in each year is unsupported by the record." St. Supp. Memo.

at 23. Taking that argument one step farther, the State contends that the jury's findings as to fair rental value "go[ ] beyond a simple judgment call regarding credibility issues[.]" *Id.* Rather, according to the State, "the jury reached a seriously erroneous result, and given the adverse impact that this verdict has when prejudgment interest is awarded on the basis of the jury's figures, the verdict amounts to a miscarriage of justice." *Id.* (citations omitted). If the court agrees with the State and grants this motion for a new trial, the State further contends that the court "must also vacate its award of prejudgment interest since that award was based on the jury's verdict." *Id.* at 26 (footnote omitted). In other words, the State is attempting to get in through the backdoor what it could not get in through the front door, *i.e.* recalculation of the prejudgment interest award.

 Other than the broad, general statements set forth above, the State does not provide any substantive reasons as to why the court should grant a new trial. Presumably the same arguments which formed the basis for the State's argument that the court should recalculate the prejudgment interest award, *i.e.* the verdict does not conform with the court's instructions or with the testimony, also form the basis for this motion for a new trial. These arguments carry no more weight just because the State is seeking different relief, that is a new trial instead of reconsideration. As the Second Circuit recently clarified, "a decision is against the weight of the evidence, for purposes of a Rule 59 motion, *if and only if* the verdict is seriously erroneous or a miscarriage of justice." *Farrior v. Waterford Board of Education*, 277 F.3d 633, 635 (2d Cir.2002) (emphasis added). Put in a slightly different way, "[u]nder Rule 59, a new trial will *only be granted* if the court determines

that the 'verdict was against the weight of the evidence [and that] the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" *Jackson v. Town of Hempstead*, No. 98–CV–5635, 2002 WL 199834, at *2 (E.D.N.Y. Feb.4, 2002) (quoting *Farrior*, 277 F.3d at 635) (emphasis added). Here, the State has not satisfied that stringent standard. Instead, it is merely reiterating arguments which the court has previously rejected, albeit in a slightly different context—that is, calculation of the prejudgment interest award.

However, the State is making a new procedural argument. In *Cayuga XVI*, this court observed that "in all likelihood, the State *did* waive its right to object to the jury's verdict as inconsistent[.]" *Cayuga XVI*, 165 F.Supp.2d at 278 n. 5. In light of that observation, although the State and the U.S. devote a fair amount of attention to their respective waiver arguments, there is no need to address the same. First of all, as the court stressed in *Cayuga XVI*, because there was no need to, it did *"not* definitively hold that the State ha[d] waived its right to object to the verdict as inconsistent[.]" *Id.* (emphasis added). Thus, to the extent the State is relying upon a finding of waiver as a possible basis for a new trial, that reliance is misplaced. Of equal if not more import is the fact that the State has not shown how the waiver issue supports a finding that somehow it is entitled to a new trial. Consequently, in all respects the court denies the State's motion for a new trial.

### III. Stay

The State is seeking a stay of execution of the $247,911,999.42 judgment in this case pending appeal. First, the State is attempting to secure an automatic stay pursuant to Fed.R.Civ.P. 62(f). Failing that, the State maintains that alternatively

the court should grant a stay pursuant to Fed.R.Civ.P. 62(d) and (h). The State further maintains that the court also should waive the posting of a supersedeas bond.[9] The State only mentions in passing Rule 62(h), which "allows a court certifying a judgment under Rule 54(b) to stay its enforcement until the entering of a subsequent judgment or judgments." *See Curtiss–Wright*, 446 U.S. at 13 n. 3, 100 S.Ct. at 1467 n. 3. Thus, given that the State has confined its analysis to the propriety of a stay under Rule 62(f) or 62(d), the court will limit its analysis accordingly.

### A. Rule 62(f): Automatic Stay

■ Relying upon Fed.R.Civ.P. 62(f), the State asserts that it is entitled to an automatic stay of the judgment in this case. Basically that Rule "adopts the state provisions of the forum state [but] *only* where the underlying judgment is 'a *lien upon* the *property of* the *judgment debtor*' in that state (i.e., where there is the functional equivalent of a bond in terms of security)." *Federal Insurance Company v. County of Westchester*, 921 F.Supp. 1136, 1138 (S.D.N.Y.1996) (quoting Fed.R.Civ.P. 62(f)) (emphasis added). As several courts have recognized, Rule 62(f) "is unambiguous." *Id.* (quoting *Marandino v. D'Elia and JOFR Assocs.*, 151 F.R.D. 227, 229 (D.Conn.1993)). Thus, " '[a]s a prerequisite, a judgment must be a lien in the state where the district is located.' " *Id.* Even in the face of Rule 62(f)'s plain language, and the State's ready admission that the judgment herein "is *not* a lien upon [its] real property[,]" the State nonetheless urges the court to enter an automatic stay under that Rule.

*See* St. Supp. Memo. at 36 (emphasis added) Although unstated, evidently the State is urging the court to expand Rule 62(f) beyond its plain meaning because if a "judgment debtor, [such as the State,] shows that it has met the requirements of [that] Rule[,]" then "a district court *must* grant a stay *without* a supersedeas bond[.]" *FDIC v. Ann–High Associates*, No. 97–6095, 1997 WL 1877195, at *4 (2d Cir. Dec.2, 1997) (citing *Hoban v. Washington Metro. Area Transit Auth.*, 841 F.2d 1157, 1158 (D.C.Cir.1988)) (emphasis added). In contrast, as will be more fully discussed below, ordinarily a party seeking a stay of a judgment pursuant to Rule 62(d) must post a supersedeas bond.

Correctly viewing Rule 62(f) as inapplicable here, the tribal plaintiffs succinctly respond that "the State has no 'automatic' entitlement to a stay in this action." Cay. Oppn. Memo. at 17. The U.S. agrees that an automatic stay is not appropriate, and urges the court to "decline to adopt New York's suggestion that it expand Rule 62(f) to apply to judgments that do not impose liens upon real property." U.S. Resp. at 31. There is no need for the court to become mired down in the State's argument for an expansion of Rule 62(f) because, as will be more fully discussed below, under the unique facts of this case the court deems it a proper exercise of its discretion under Rule 62(d) to both grant a stay pending appeal *and* to waive the State's posting of a supersedeas bond.

### B. Rule 62(d): "Discretionary" Stay

Subject to the exceptions set forth in Rule 62(a), none of which apply here, Rule

---

**9.** A supersedeas bond is "required of one who petitions to set aside a judgment or execution and from which the other party may be made whole if the action is unsuccessful." *Adsani v. Miller*, 139 F.3d 67, 70 n. 2 (2d Cir.1998) (internal quotation marks and citation omit-

ted). "In addition, 'supersedeas' refers to the name of the writ containing a command to stay proceedings at law, suspending the power of the trial court to execute on the judgment appealed from." *Id.* (citations omitted).

62(d) provides in pertinent part that "[w]hen an appeal is taken the appellant by giving a supersedeas bond *may* obtain a stay[.]" Fed.R.Civ.P. 62(d) (emphasis added). As will be more fully explained below, the State automatically would be entitled to a stay under Rule 62(d) if it were willing to post a supersedeas bond, but it is not. Instead, not only is the State seeking a stay of the judgment pending appeal, but it is also seeking to have the court invoke "equitable principles" under Rule 62(d) to waive the posting of a supersedeas bond. *See* St. Supp. Memo. at 38 and 46.

In deciding whether an appellant is entitled to a stay under Rule 62(d), a court should consider four factors:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*County of Westchester*, 921 F.Supp. at 1138 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987)). Flexibility is essential when considering those factors. *See Morgan Guar. Trust Co. v. Republic of Palau*, 702 F.Supp. 60, 65 (S.D.N.Y.1988), *vacated on other grounds*, 924 F.2d 1237 (2d Cir.1991). Separately analyzing the four factors enumerated above, the State concludes that each of them is easily met and hence it is entitled to a stay of the judgment.

The U.S. "does *not* object to the State's request for a stay pending appeal pursuant to Rule 62(d)[,]" but rather than examining the four *Hilton* factors identified above, it "believes" that the State's purported status as a solvent judgment creditor "is controlling[.]" *See* U.S. Resp. at 33. Thus

the U.S. reasons, "there is little to no risk of harm to the Plaintiffs if the Court grants a stay here." *Id.*

The tribal plaintiffs are taking the exact opposite view, maintaining that in deciding the propriety of a stay, the court should examine each of the four factors enumerated above. When the court does that, the tribal plaintiffs assert that the State is unable to meet its "burden as to *any* of the four elements, let alone all of them." Cay. Oppn. Memo. at 18. Consequently, they contend that it is not proper to stay execution of the judgment in this case. Recognizing the right to an automatic stay under Rule 62(d) in conjunction with the posting of a bond, however, the tribal plaintiffs do not object to a stay if the States "post[s] ... a bond sufficient to cover the judgment during the anticipated protracted appeal." *Id.* at 20.

As the foregoing outline of the parties' respective positions shows, in deciding whether the State is entitled to a stay, the first issue is whether the court should invoke the "familiar" four-part formula of the Supreme Court, *see County of Westchester*, 921 F.Supp. at 1138, or whether, as the U.S. contends, it should disregard those factors and simply rely upon the State's purported solvency as a judgment creditor.

There is some validity to the U.S.' assertion that resolution of the stay issue does not require an analysis of the four *Hilton* factors. It is not as the U.S. suggests, however, the State's claimed status as a solvent creditor which is dispositive. Despite the seemingly discretionary language of Rule 62(d) (*i.e.*, an appellant "*may* obtain a stay"), there is a significant body of case law "interpret[ing] [that] Rule ... as entitling an appellant to a *stay* as a *matter of right* upon posting of a supersedeas bond *or* upon the court's waiver of the

bond requirement where the appeal is taken from a monetary judgment or its equivalent." *Yankton Sioux Tribe v. Southern Missouri Waste Management District,* 926 F.Supp. 888, 890 (D.S.D.1996) (and cases cited therein) (emphasis added). Plainly any appeal in the present case will be from a monetary judgment. Thus after *Yankton Sioux,* if the State prevails on its waiver of bond argument, arguably it would be entitled to a stay as a matter of right. Analyzing the stay issue in this way, would obviate the need for a separate analysis of the four stay factors articulated above.

■ In an abundance of caution, however, and because there is some support for analyzing the stay issue first and then proceeding to the waiver issue,[10] the court will consider the four stay factors. When it does that, even in a rather cursory manner, the court has little difficulty finding that a stay of the execution of this $247,911,999.42 judgment is warranted. The fact that "applications for stays are generally granted[,]" *see John Hancock,* 1993 WL 515376, at *1, lends further credence to the court's determination that the unique facts of this case mandate staying execution of the judgment herein.

Addressing the four stay elements in reverse order, the court finds there is a broader public interest at stake here which strongly favors granting a stay—the impact a stay or denial of a stay will have on New York State taxpayers. As the State's Director of the Division of the Budget, Carole E. Stone, avers, and the court agrees, "it [would be] against the public

interest to pay the judgment before appeals are finally exhausted[,] . . . and would seriously prejudice the taxpayers." Affidavit of Carole E. Stone (Oct. 16, 2001) at 2, ¶¶ 2 and 4. As Ms. Stone convincingly explains, immediate payment of this nearly $250 million judgment would seriously prejudice State taxpayers because if the "monies were spent on purchasing land, buildings or other capital items, and the judgment were later overturned, it could be extremely difficult and disruptive to recover any funds already expended." *Id.* at ¶ 4. The court also agrees with the State's observation that "in the event of a reversal on appeal, the plaintiff Tribes, which have limited resources, may not be able to repay any funds that they spend during the pendency of the appeal." *Id.* This too bolsters the court's finding that the broader public interest *vis-a-vis* New York State taxpayers as a whole augurs in favor of granting a stay.

Furthermore, as detailed more fully in the affidavits of Raymond E. Lockwood, Vice–Chairman of the Cayuga County Legislature, and Robert W. Hayssen, Chairman of the Seneca County Board of Supervisors, the court finds that without a stay there is a very real possibility that other parties interested in this litigation will be substantially harmed. Such harm could result from a significant loss in the Counties' respective tax bases if during what will undoubtedly be a lengthy appeal process, the tribal plaintiffs use judgment monies to purchase land in the claim area—land which would be non-taxable, thus reducing the Counties' tax bases and

---

10. *See, e.g., Endress + Hauser, Inc. v. Hawk Measurement Systems Pty. Ltd.,* 932 F.Supp. 1147, 1148 (S.D.Ind.1996) ("Initially, we must decide whether Hawk is entitled to a stay pending appeal. If we find that a stay is appropriate, we must then decide whether to waive the supersedeas bond requirement and allow some form of alternate security[.]");

*John Hancock Mutual Life Ins. Co. v. Amerford International Corp.,* No. 91 Civ. 8635(JFK), 1993 WL 515376, at *1 (S.D.N.Y. Dec.8, 1993) ("Prior to deciding whether the equities of this case require the posting of a partial supersedeas bond (or no bond at all), it is necessary first to consider whether the Court should order a stay at all.").

tax revenue generally. *See* Affidavit of Raymond E. Lockwood (Oct. 12, 2001) at 2, ¶¶ 5–7; and Affidavit of Robert W. Hayssen (Oct. 15, 2001) at 2, ¶¶ 5–7. In short, as in *River Oaks Marine, Inc. v. Town of Grand Island,* No. 89–CV–1016S, 1992 WL 406813 (W.D.N.Y. Dec.10, 1992), "[m]any innocent third parties may suffer if execution is allowed to proceed." *Id.* at *1 (citing *Olympia Equipment v. Western Union Telegraph Co.,* 786 F.2d 794 (7th Cir.1986)). Moreover, the court cannot ignore the fact that there would be no concomitant harm to the tribal plaintiffs if it grants a stay because they would be entitled to post-judgment interest. *See* 28 U.S.C. § 1961.

On the other hand, the State cannot show the requisite irreparable harm absent a stay. The State's argument of irreparable harm is seriously undermined "by the well-established principle that quantifiable money damages cannot be deemed irreparable harm." *See Harris v. Butler,* 961 F.Supp. 61, 63 (S.D.N.Y.1997) (citing, *inter alia, Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989)). Because the judgment herein is only for "quantifiable money damages," the State is unable to establish this particular stay element.

As to the likelihood of success on appeal, "court[s] ha[ve] required only that the petitioner demonstrate a 'substantial case on the merits,' even if ultimate success is not a mathematical probability." *Morgan Guar. Trust,* 702 F.Supp. at 65 (citing *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977)). Here, there is no need to engage in a detailed analysis of the relative merits of any appeal by the State. As the court in *Morgan Guar. Trust* so succinctly put it, "because of the difficulties of the issues ... presented, it would be foolhardy to predict that

there is no likelihood of success on appeal." *Id.* Moreover, as the D.C. Circuit recognized in *Holiday Tours,* " 'tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo be maintained.' " *Id.* at 66 (quoting *Holiday Tours,* 559 F.2d at 844–45). The difficult legal questions which have arisen during the course of this more than twenty-year old litigation are legion. Furthermore, as detailed in the Stone, Lockwood and Hayssen affidavits, given the potential for significant disruption to the centuries-old status quo, the equities overwhelmingly favor maintaining the status quo pending appeal. Given the unique nature of this land claim litigation and the myriad of novel legal issues presented nearly every step of the way, particularly in the more recent damage phases, this case cries out for maintenance of the *status quo.* Simply put, even though denial of a stay would not result in irreparable harm to the State, because the other factors tip decidedly in favor of a stay, the court finds such relief is justified.

Having determined that the unique facts of this case mandate staying execution of the judgment, the court must next address the State's contention that it should not be required to post a supersedeas bond in this case. Arguing that as a "sovereign ... plainly [it] has the financial ability to pay the full judgment with accrued interest[,]" the State maintains that the court should waive the posting of a bond. St. Supp. Memo. at 47 (citing Stone Aff. at ¶¶ 2, 3 and 5) (other citation omitted). The State further offers that the posting of a bond "is unnecessary ... and against the broader public interest." *Id.* Finally, if the court declines to waive the posting of a bond and finds that an alternative form of security or a reduced bond is required, then "the State submits that there should

be further proceedings conducted to determine the nature and amount of security that would be appropriate[.]" *Id.* at 48.

"[A]ccept[ing] the State's representations that it will make good as a judgment creditor," the U.S. "does *not* object to the State's request to waive a bond[ ]" pending appeal. U.S. Resp. at 1 (emphasis added). More specifically, relying upon the State's assurances through its Director of the Division of Budget that "it will satisfy any judgment determined after exhausting appeals[,]" the U.S. asserts that waiver of a supersedeas bond is proper here. *Id.* at 34 (citing Stone Aff. at ¶¶ 2, 3, and 5). Moreover, the U.S. points to the potential for "wast[ing] the State's resources[ ]" if the State is forced to obtain a bond. *Id.*

Again in contrast to the U.S., the tribal plaintiffs *do* object to waiving the bond requirement for the State. The tribal plaintiffs posit two reasons why waiver of the supersedeas bond is not proper. First they challenge the State's assertion that it can satisfy the judgment upon legislative appropriation, speculating because "of the political controversy surrounding this case[,]" plaintiffs may "face an attempt by the State to block final payment in some way by politicians with a 'Native American' agenda." Cay. Oppn. Memo. at 20. Second, the tribal plaintiffs question the State's ability to pay the judgment if, as the State suggests, it will have difficulty posting a bond.

 "It is commonly understood that '[t]he purpose of a supersedeas bond is to preserve the status quo while protecting the non-appealing party's rights pending appeal.'" *Harris*, 961 F.Supp. at 62 (quoting *Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1190–91 (5th Cir.1979)) (other citation omitted). The requirement of posting a supersedeas bond "serves three purposes—*viz.*, it allows an appellant

to pursue an appeal without first satisfying the judgment, it protects an appellee's rights and ability to collect the judgment and it guarantees an appellee the costs of delay incident to the appeal." *Brabson v. Friendship House of Western New York, Inc.*, No. 94–CV–0834, 2000 WL 1335745, at *1 (W.D.N.Y. Sept. 6, 2000) (citation omitted). "In spite of the general requirement that a judgment debtor post a supersedeas bond in the full amount of the judgment, . . ., the district court, in its discretion, may use equitable principles to grant such a stay without a full bond if the filing of a supersedeas bond would irreparably harm the judgment debtor and, at the same time, such a stay would 'not unduly endanger the judgment creditor's interest in ultimate recovery.'" *Port Chester Electrical Construction Corp. v. HBE Corp.*, No. 86 Civ. 4617, 1991 WL 258737, at *1 (S.D.N.Y.1991), *rev'd on other grounds*, 978 F.2d 820 (2d Cir.1992) (quoting *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1155 (2d Cir.1986), *rev'd on other grounds*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)) (other citation omitted). In this regard, the Second Circuit has "held that in some circumstances an 'inflexible requirement' for 'denial of a stay of execution unless a supersedeas bond is posted' can amount to unjust confiscation of the debtor's property[.]" *Liberty Mut. Ins. Co. v. Bankers Trust Co.*, 769 F.Supp. 130, 131 (S.D.N.Y.1991) (quoting *Texaco*, 784 F.2d at 1154) (other citation omitted). Other factors germane to the determination as to whether to waive the posting of a bond include "the degree of confidence that the district court has in the availability of funds to pay the judgment...; [w]hether the defendants' ability to pay the judgment is so plain that the cost of a bond would be a waste of money ...; and '[w]hether the defendant is in such a precarious financial situation that the require-

ment to post a bond would place other creditors of the defendants in an insecure position[.]' " *Dillon v. City of Chicago,* 866 F.2d 902, 904 (7th Cir.1988) (internal quotation marks and citations omitted).

The State, as the moving party, has the burden of "objectively demonstrat[ing]" the reasons why the court should "depart from the usual requirement of a full security supersedeas bond to suspend the operation of an unconditional money judgment[.]" *See Port Chester Electrical,* 1991 WL 258737, at *2 (internal quotation marks and citation omitted). In this vein, it should be noted that "[a]lthough courts sometimes waive the full supersedeas requirement, they often require alternative security considerably in excess of the amount of the judgment." *Id.* (citations omitted).

 The waiver issue need not detain the court for long. Given its status as a "sovereign taxing authority[,]" *see* Stone Aff., at 2, ¶ 5, the court is confident in the State's ability to pay the judgment herein. *See Ortiz v. New York City Housing Authority,* 22 F.Supp.2d 15, 40 (E.D.N.Y. 1998), *aff'd on other grounds,* 198 F.3d 234, 1999 WL 753153 (2d Cir.1999) (granting motion for stay of execution with waiver of supersedeas bond because, as a government subdivision, City Housing Authority had "ample means" to satisfy the judgment); *River Oaks Marine,* 1992 WL 406813, at *2 (granting defendants' motion to stay execution of judgment without posting a bond or obtaining other security because, *inter alia,* defendant was a municipal corporation); *accord Norco Constr., Inc. v. King County,* 106 Wash.2d 290, 721 P.2d 511, 514 (1986) (state and counties exempt from posting supersedeas bonds because the government treasuries serve as guarantees that any award of damages can be collected). Relying in part upon the Director of the Division of

Budget's averment that "the plaintiffs can be secure that upon legislative appropriation, any judgment, and statutory post-judgment interest, will be paid by the State[,]" plaintiffs' rights and their ability to collect on this judgment against the State will not be jeopardized during the appeal process even without the posting of a bond. *See* Stone Aff. at 2, ¶ 5. Furthermore, because plaintiffs will be entitled to post-judgment interest which, as just noted, the State recognizes it must pay, a bond is not needed to ensure plaintiffs the cost of delay incident to appeal. Surely the prospect of additional interest on this sizeable judgment should be more than sufficient motivation for the State to proceed in a timely fashion with this appeal.

In addition, in assessing the need for a supersedeas bond the court cannot overlook principles of state sovereignty and federalism. *See Easter House v. State of Illinois Department of Children and Family Services,* 645 F.Supp. 107, 108 (N.D.Ill. 1986). Here, as in *Easter House,* this "federal court[ ] [would] ... not [be] show[ing] respect for the dignity and interests of ... [New York] [S]tate by requiring it to post a supersedeas bond where, ..., [the] [tribal] plaintiff[s] seriously challenge[ ] neither the state's willingness nor its ability to satisfy an adverse judgment." *Id.* Likewise, the tribal plaintiffs have *not* shown that "the complexity of the State's collection process [nor] the amount of time required to collect on a judgment after it is affirmed on appeal[,]" *see Federal Deposit Insurance Corporation v. A & R Construction, Inc.,* 921 F.Supp. 153, 155 (citations omitted), somehow justify requiring the State to post a supersedeas bond.

Finally, the court cannot ignore the fact that not only would a bond need to be sufficient to cover the face value of the judgment, but, as Local Rule 67.1 requires, it would need to be for an additional 11%

"to cover interest and any damage for delay as may be awarded, plus $250 to cover costs." *See* L.R. 67.1. Given that "it would be almost impossible to find a bonding agency willing and able to secure a judgment of this size[,]" and that "the potential costs to the State of posting a bond . . . would be prohibitively expensive[,]" *see* Stone Aff. at 3, ¶ 6, the posting of a supersedeas bond here would be "far from practicable." *See International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,* 62 B.R. 723, 732 (S.D.N.Y.1986) (quoting *Federal Prescription Service v. American Pharmaceutical Association,* 636 F.2d 755, 760–61 (D.C.Cir.1980)). Due to all of these "unusual circumstances," including the fact that the judgment debtor is the State of New York, and thus the tribal plaintiffs' interests as judgment creditors "would not be unduly endangered[ ]" even if the State is not required to post a supersedeas bond, the court waives the requirement of posting such a bond in this case. *See Texaco,* 784 F.2d at 1155 (citation omitted).

### IV. Substitution of Successor State Agencies

There is one final procedural matter pertaining to the judgment in this case, and that is the State's motion to substitute "the successor State agencies for the Stage agency defendants named in plaintiffs' complaints." *See* St. Supp. Memo. at 49. As detailed in the State's supporting memorandum of law, several of the State agencies named as defendants in the tribal plaintiffs' complaints are no longer in existence. *See id.* Likewise, because this litigation has spanned more than two decades, there have been changes in the individual public official defendants. There being no opposition to this substitution motion, and for the reasons set forth in the State's supporting memorandum, *see id.* at 49, in accordance with Fed.R.Civ.P.

25(d), the court hereby grants the court's motion to revise the caption with respect to the State defendants, in the manner reflected in exhibit D to attorney Roberts' affirmation of October 15, 2001.

### V. Tribal Plaintiffs' "Conditional" Motion

In moving for a new trial pursuant to Fed.R.Civ.P. 59(a) and seeking an additional $1,749,963,279 in prejudgment interest, the tribal plaintiffs emphasize that they are seeking such relief "only, *and in that event only,*" if this court "grants a new trial or otherwise amends the judgment at the request of the State of New York or *any other party* [.]" *See* Amended Notice of Conditional Motion at 1 (emphasis added). Given the court's rulings herein, in combination with the terms in which this "conditional" motion is couched, the court hereby denies the same as moot.

### VI. Tribal Plaintiffs' Miscellaneous Motions

Taking issue with the court's 60% reduction of Dr. Berkman's prejudgment interest calculations, the tribal plaintiffs are seeking to have the court "amend its Phase II findings to adopt the Cayugas' expert's conclusions as to the amount of prejudgment interest[.]" Memorandum of Law In Support of Conditional Motion for a New Trial and Amendment of Findings and Judgment at 13. The court finds no merit to this argument and adheres to its prior rulings in this regard. Therefore, the court denies the tribal plaintiffs' motion to amend the judgment pursuant to Fed.R.Civ.P. 52(b) and 59(e).

Lastly the tribal plaintiffs are seeking to have this court "reconsider its pre-trial determination denying ejectment as a remedy." *Id.* at 14. The tribal plaintiffs reason that the court should revisit this issue

because "[i]n weighing the equities of granting ejectment, the Court . . . emphasi[zed] . . . laches, which it attributed to the Cayugas in failing to commence this action earlier." *Id.* Further, the tribal plaintiffs reason, because the court has "now determined that no finding of laches against the Cayugas is warranted, [it] should reconsider its decision denying ejectment as a remedy." *Id.* There is no sound reason for revisiting the ejectment issue. Laches was only one of several factors which this court considered in deciding whether or not ejectment was a viable remedy in this case; it was not the determinative factor. *See Cayuga Indian Nation of New York v. Cuomo,* Nos. 80–CV–930, 80–CV–960, 1999 WL 509442 (N.D.N.Y. July 1, 1999). Moreover, because the issue of ejectment has been thoroughly litigated, briefed and resolved, there is no valid reason for reopening that contentious issue. Thus, the court hereby denies the tribal plaintiffs' motion to grant ejectment as a remedy.

### Conclusion

After carefully considering the parties' numerous post-trial motions, for the reasons set forth herein the court hereby:

(1) DENIES without prejudice to renew the non-State defendants' motion to amend the judgment pursuant to Fed.R.Civ.P. 52(b);

(2) GRANTS the tribal plaintiffs' motion for certification pursuant to Fed.R.Civ.P. 54(b);

(3) GRANTS the plaintiff-intervener U.S.' motion to dismiss all defendants except the State of New York from its complaint in intervention;

(4) DENIES the tribal plaintiffs' motion for additional prejudgment interest;

(5) GRANTS the State' motion to amend the judgment to provide that it runs jointly in favor of the U.S., as trustee, and the tribal plaintiffs;

(6) DENIES without prejudice to renew the State's motion to amend the judgment to run exclusively in favor of the U.S.;

(7) DENIES the State's motion for judgment as a matter of law pursuant to Fed.R.Civ.P.50;

(8) DENIES the State's motion for reconsideration seeking recalculation of the prejudgment interest;

(9) DENIES the State's motion for a new trial pursuant to Fed.R.Civ.P. 59(a);

(10) GRANTS the State's motion for a stay of execution of the judgment and to waive the posting of a supersedeas bond pursuant to Fed.R.Civ.P. 62(d);

(11) GRANTS that State's motion for substitution of the successor State agencies pursuant to Fed.R.Civ.P. 25(d);

(12) DENIES the tribal plaintiffs' "conditional" motion for a new trial pursuant to Fed.R.Civ.P. 59(a);

(13) DENIES the tribal plaintiffs' motion to amend the judgment pursuant to Fed.R.Civ.P. 52(b) and 59(e); and

(14) DENIES the tribal plaintiffs' motion for reconsideration of the court's prior determination denying ejectment as a remedy.

The Clerk of the Court is hereby directed to amend the October 2, 2001 judgment accordingly.

IT IS SO ORDERED.